# NOVEMBER 14, 1945

### James Roberts v. The State.

No. 23169. Delivered June 27, 1945.
Rehearing Denied November 14, 1945.

The opinion states the case.

*Stinson, Hair, Brooks & Duke,* of Abilene, for appellant.

*Esco Walter,* District Attorney, of Abilene, and *Ernest S. Goens,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was convicted of murder without malice, and sentenced to serve five years in the State penitentiary. He appeals.

The evidence shows that appellant was employed as a cook in a coffee shop in Stamford, in Jones County, and that he and the deceased, Alvin Marsh, were friends. On the day of the

homicide deceased came to the place where appellant was employed, and they passed a few friendly remarks. Shortly, however, an argument arose between them, with considerable cursing. Appellant, who was "boning" a ham, had a knife in his hand, and, as the cursing proceeded, he finally slapped the deceased and ordered him out of the house. The deceased either went out the door or was pushed out, and there was further cursing. Eventually appellant went out the door and approached the deceased, who finally possessed himself of a piece of timber one by four and about eight or ten feet long and struck at appellant. The piece of timber struck the door and broke, a portion thereof striking appellant. The deceased then continued an effort to strike with the broken piece of timber left in his hand; then walked across the street, staggered against a sign, and fell in an alley. It developed that deceased was mortally wounded from a knife thrust in his body, from which he died.

There is but one bill of exceptions in the record, and that relates to what is claimed as newly discovered evidence of two witnesses, S. B. Bruce and one T. W. Newman. It is evident from the record that appellant had knowledge that a witness would testify to substantially the same facts as he now alleges that T. W. Newman would testify to at the time he filed his first application for a continuance about the 10th of May, 1944, but he mistakenly alleged the absent witness' name to be L. W. Shuman. That application set up practically the same testimony intended to be proven from said witness Shuman as it set up in the present amended motion for a new trial and expected from T. W Newman. Evidently this motion for a continuance was granted, as well as a second motion for a continuance, and upon the trial thereof a third motion for a continuance, on account of the absence of another witness, was overruled by the trial court, and this cause went to trial on January 15, 1945.

The State suggests that from May, 1944, the date of the filing of the first motion for a continuance, to the time of this trial, appellant as well as his attorneys knew that a witness was in existence who would testify as Mr. Newman finally offers to testify, the only difficulty being that whoever had told appellant about this witness had left the impression on appellant that the desired witness' name was Shuman.

The testimony shows that this alleged offense took place on February 12, 1944, and appellant testified that he heard about the witness Shuman some two weeks after the homicide; that he notified his attorneys relative thereto; that he only stayed

in jail about an hour and was released upon bond, and so remained. Nowhere is it shown that appellant went back to the witnesses from whom he had learned what Shuman would testify to and attempted to locate him, or to obtain a description of the desired witness, but he seems to have relied upon the application for a subpoena for Shuman, and the return thereon showing him to be "unfound." This reliance seemed to have been well founded, and his motion was granted on or about May 10, 1944; the matter seems to have rested there until about three days after the present trial, at which time Mr. Newman was discovered, about eight months after the first continuance, and eleven months after the original discovery of a witness who would testify as Mr. Newman now offers to do. Relative to the original information as to the witness Shuman, appellant testified on the hearing of the motion for a new trial:

"On this application for continuance on account of Mr. Shuman, I understand it to be Mr. Shuman, when I made that application for him. I had information as to what he saw, I heard it, as stated in my application for continuance. Whoever he may be. He may have been this man Newman or may not; I don't know about that. It might have been some other person, I don't know. But I understand that Mr. Shuman, or whatever his name may have been, would testify to the facts as he saw it."

We do not think appellant has shown sufficient diligence in the matter of finding out the true name of Newman; had he ascertained this witness' true name, it is shown that the witness was easily accessible.

We also think that the testimony that Newman would have given was but cumulative of other testimony given at the trial.

Appellant himself testified as to the argument in the cafe; how it grew warmer; how the deceased called appellant a liar; how appellant slapped the deceased; how deceased left the cafe, and was cursing appellant outside on the sidewalk; how appellant went to the door and stepped outside; how deceased struck at him with a plank; how the plank hit the door and broke, and the broken piece hit appellant; how the deceased started to strike him again; how appellant swung at deceased one time, and deceased ran into the street, and appellant went back into the cafe, finished "boning" the ham, and did not know he had cut the deceased. As to his intent, appellant testified:

"I did not intend to kill him. I hit him to keep him from hitting me with the stick, so I could get back into the coffee shop.

He was drawing it on me. He had it raised again and was coming down with it. It hurt me when it hit me. It hit me on the shoulder and then got my elbow."

Appellant places on the witness stand Ben Lackey, who testified: ·

"Well, sir, I was walking down the sidewalk, just as a man will, looking in front of me, I saw James push this boy out the door of the coffee shop. As he pushed him out, the boy clinched him and pulled him out with him—he pulled James out. That's what I say, as he pushed him out the door, the boy clinched with him, and they clinched a minute or two, and James slung him loose from him. There was a long piece of 1 x 4 lumber laying there. This boy got hold of it and swung at James. The length of the stick was so long, as it came over, it kind of clipped that door just a little, and then hit James on the shoulder a little, along in here (indicating) ; but the lick on the building, or on James, I don't know which, broke the stick in two. Then James turned from the door and they clinched again, and James slung him, slung him loose to the edge of the curb; and then went back in the door of the building. * * *

"As to whether or not Marsh tried to strike at James the second time, well, when they clinched, at this second· clinch, he was drawn up with the stick, or what was left of the stick, about one-half of the stick. I imagine it was about a ten foot 1 x 4, or eight or ten feet to start with, and it was just about broke in the middle, looked to me like, and that was about that much of it left. * * *

"I did testify that James was headed for the kitchen, when Alvin started to pick up the 1 x 4. It didn't take him much time to pick it up, raise it and start to hit James, because he was still in a crouch on the sidewalk, when he came up with it. While he was in that crouch, James was going into the kitchen, or headed that way, when he came up with the 1 x 4. James was headed that way and going into the kitchen, from the time that Alvin picked it up, that 1 x 4, and Alvin got it up to hit him.

"It would have taken James a little bit to get in that door, because there was a screen on it and he had to open the screen.

"After they had clinched one more time, and James had slung him loose from him and slung him out to the edge of the curb, James did go on in the kitchen. As to whether there was anything there to prevent James from going on into the kitchen after Alvin let him loose, I'll say it looked to me like he would have got the top of his head knocked off, if he had attempted

to go in there, unless he got the man away from him, because he was still striking, and after it broke off, he had a pretty good club, looked to me like. * * *

"I did not see Marsh use anything else, other than that 1 x 4 that I have described. I saw him pick that up, after James had pushed him out the door and after they had a little scuffle on the sidewalk, and after James had gotten loose from him. He picked it up then. I never did see James with anything in his hand at any time—after he started back in that kitchen and got under the recess of that door, or any time. But they did have just a little struggle, one more time. That struggle didn't last very long—just enough for him to get loose from him, and sling him pretty close to the curb. * * *

"The first time that James broke loose from Alvin, I say that Alvin did not go over and pick up this long 1 x 4—he was down, and he just reached for it. When Marsh first started, he hit the side of the building and broke off a part of that plank—the piece didn't exactly separate, but it came down; there would be a little sliver hanging together. Alvin had the stick at that time when he clinched the second time; he never did let loose of it. The way I saw it, he had never let loose of that stick, when they clinched the second time. He never picked up a second stick; that one stick is all he had."

This witness also saw an elderly gentleman who came along there where the difficulty took place; he did not know his name; he made no inquiries relative thereto. An analysis of this witness' testimony will show that appellant had the benefit of this testimony which is substantially the same as that of appellant, as well as that of the desired testimony of the witness Newman. Mr. Newman did testify on the motion for a new trial; That he knew appellant; had known him for many years, and while drinking coffee in the cafe on the day of the homicide he saw appellant, who could have seen Newman; he heard a fuss in the kitchen; some one being ordered out of the kitchen. He saw appellant push the deceased out of the door of the kitchen; deceased picked up a scantling and struck at appellant and broke it off, leaving a small piece in his hand; the deceased struck at appellant with this piece and hit the wall, and appellant began dodging all he could. While the affidavit attached to the motion for a new trial is much more voluminous, the witness, when placed on the stand, gave substantially the testimony above set forth.

Mr. Bruce, the second newly discovered witness, testified on the hearing of the motion for a new trial:

"I did not see Marsh go over there by the sidewalk and curb and pick up that 1 x 4 scantling. The first thing I seen, was Marsh whipping this fellow yonder right over the head—James Roberts there. Hitting him with a piece of timber, looked like; my idea about it, it might have been a little too long for a stick. I never noticed where he got that thing that was a little too long for a stick. I did not see him pick it up there on the curb, but there was a pile of old boxes and chicken coops there, where he might have got it. * * *

"I seen Marsh whipping this boy over the head with a scantling—I don't know—it must have been four to six feet long. I don't think I said in my affidavit that I signed and swore to, that I saw him pick that scantling up. I saw him whipping him over the shoulders."

The first motion for a continuance filed May 10, 1944, appears in the record, and shows the name of the desired witness to be L. W. Shuman, and that appellant expected to prove by him that deceased was cursing appellant while outside the cafe; that the deceased picked up some piece of wood and struck appellant therewith about the head and body, and deceased continued to curse and abuse appellant, and that appellant did not strike deceased until after he had been struck by the piece of wood, and then he struck but one time. This continuance was granted, and a third application was filed on the day this cause went to trial, January 15, 1945.

"Applications for a new trial on the ground that new testimony material to the defendant has been discovered since the trial will be scrutinized by the appellate court with much strictness. They are addressed much to the discretion of the trial court, and where the trial court has refused such an application, the appellate court will not reverse unless it shall appear that the trial court has abused its discretion and that thereby injustice may have been done the defendant. Bell v. State, 1 Tex. App. 598; Shultz v. State, 5 Tex. App. 390; Templeton v. State, 5 Tex. App. 398; Burns v. State, 12 Tex. App. 278; White v. State, 19 Tex. App. 343; Johnson v. State, 62 Tex. Cr. R. 284; 136 S. W. 1058; Gray v. State 144 S. W. 284; McGaughey v. State, 169 S. W. 289." Branch's Penal Code, p. 124-125.

We are not impressed with the belief that had the two newly discovered witnesses testified, that their testimony would have been likely to have changed the result of the trial. Branch's P. C., p. 128, Sec. 200. We also are of the opinion that such newly discovered testimony is but cumulative of that of both

appellant and his witness Lackey, and is practically not contradicted by any State's witness. Sec. 203, Branch's P. C.

In the early case of Riojas v. State, 36 Tex. Cr. R. 188, it is said in a quotation from an early case:

"* * * Evidence is cumulative which merely multiplies witnesses to any one or more of those facts before investigated, or only adds other circumstances of the same general character. But that evidence which brings to light some new and independent truth of a different character, although it tend to prove the same proposition or ground of claim before insisted on, is not cumulative, within the true meaning of the rule on this subject."

We think the trial court did not abuse his discretion when he failed to grant a new trial on the ground of newly discovered testimony. This being the only question presented to us for review, this judgment is accordingly affirmed.

### ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

In his motion for rehearing appellant insists that we were in error in not sustaining his contention that the judgment should be reversed because the trial court declined to grant a new trial on the ground of newly discovered evidence.

In order to consider the question intelligently it became necessary to again review the evidence upon the main trial and also that produced upon the hearing of the motion for new trial. This has been done. It would serve no useful purpose to set out the evidence in detail and to do so would extend this opinion to unpardonable length; therefore, we content ourselves with the statement of our conclusions only.

The question of diligence in not discovering the new evidence until after the trial may be debatable. However, a careful review of all the evidence presented on the trial, and upon the hearing of the motion for new trial, rather confirms our original opinion that the evidence claimed to be newly discovered is cumulative in that "it only adds other circumstances of the same general character" to the evidence produced upon the trial.

We, therefore, remain of the opinion that the trial court can not be held to have abused his discretion in overruling the motion for new trial.

The motion for rehearing is overruled.